UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JUSTIN YATES, DAVID ROBERTS, MICHAEL MAYES, NICHOLAS JACOB, AND JONELLIO BERCASIO,<br><br>Plaintiffs,<br><br>v.<br><br>JOE FITHIAN, Director of Public Safety, Bellevue Community College, and LAURA E. SAUNDERS, Vice President, Bellevue Community College,<br><br>Defendants. | CASE NO. CV09-01289-RSM<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART, AND GRANTING PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT |

## I. INTRODUCTION

This matter comes before the Court on Motion for Summary Judgment (Dkt #21) brought by Defendants Fithian and Saunders ("Defendants"), and on Cross-motion for Partial Summary Judgment brought by Plaintiffs Yates, Roberts, Mayes, Jacob, and Bercasio ("Plaintiffs"). Dkt #

1  32.  Plaintiffs allege in this action that defendants excluded them from the Bellevue College[1]

2  ("College") gymnasium while a Maria Cantwell Campaign event was taking place.  Dkt #5.

3  Plaintiff students claim that they were refused entry because they wore t-shirts bearing the name

4  of Cantwell's opponent, and that as a result, their First Amendment rights were violated.  *Id.*

5  Plaintiffs seek damages for deprivation of their rights under the constitutions of the United States

6  and Washington, and bring claims for compensatory and punitive damages under 42 U.S.C.

7  §1983, costs and attorneys fees under 42 U.S.C. §1988, along with any additional equitable relief

8  as the Court sees fit.  *Id.*  Defendants seek summary judgment on all claims, arguing that

9  plaintiffs are not entitled to relief because their freedom of speech has not been violated, and

10 because defendants are entitled to qualified immunity.  Dkt #21.  Plaintiffs seek summary

11 judgment on the issue of liability, arguing that their free speech rights were violated, and that

12 defendants are not entitled to qualified immunity.  Dkt # 32.  Plaintiffs seek to reserve only the

13 issue of damages for trial.  *Id.*

14                            **II.    BACKGROUND**

15       In the fall of 2006, plaintiffs Justin Yates, David Roberts, Michael Mayes, Nicholas

16 Jacob, and Jonelli Bercasio were all students at Bellevue College.  Dkt #5, ¶1-5.  Defendant

17 Laura Saunders was the Vice President for Administrative Services for Bellevue College and

18 Defendant Joe Fithian was the Director of Public Safety.  Dkt #5, ¶6-7.

19       The College agreed to rent the gym to the Cantwell Campaign for the purpose of holding

20 a campaign rally that would take place on October 26, 2006 where Senator Cantwell and then-

21 Senator Barrack Obama would give a speech.  Dkt #5, ¶21.  Among other things, the agreement

22

23
    [1] Formerly Bellevue Community College, as it was known at the time of the events that
24  gave rise to this lawsuit.

1  specified that the College reserved the right to cancel an event in progress if event staff or

2  participants refused to cooperate with College security staff or College staff generally.  Dkt #24,

3  Exhibit 1, Cancellation ¶ 2.  On October 24, Fithian sent an e-mail stating that all Bellevue

4  College students, faculty, and staff were welcome to attend the event.  Dkt #24, Exhibit 3.

5        On the morning of the event, plaintiffs waited in line to enter the gymnasium.  Plaintiffs

6  were wearing t-shirts bearing the name "McGavick," who was Cantwell's opponent.  Dkt #5,

7  ¶29.  When plaintiffs tried to enter the event, campaign staff including Tim Barry, who was the

8  campaign's contact person for the College, refused to permit their entry while they were wearing

9  the "McGavick" t-shirts.  Dkt #5, ¶30.  Fithian noticed the raised voices and saw that plaintiffs

10 were involved in an argument with Barry over his refusal to allow them to enter the gymnasium.

11 Dkt #22, Exhibit 3, pgs. 28-29.  Fithian located Saunders to seek direction regarding how to deal

12 with the situation.  Dkt #22, Exhibit 3, p. 35.  Fithian told Saunders that he was concerned for

13 plaintiffs' safety due to participants at the rally yelling at plaintiffs, and therefore he believed that

14 they should not be allowed to enter.  *Id*.  Saunders continued to speak with Barry, attempting to

15 persuade him to allow plaintiffs to enter.  Dkt #22, Exhibit 3, pgs. 36-38. Ultimately Saunders

16 accepted Barry's argument that the space was privately rented, despite plaintiffs' ongoing

17 protestations that the gymnasium is a public space.  *Id*.  Saunders and Fithian explained to the

18 students that they would not be admitted to the event.  Dkt #5, ¶33.  On the evening of the event,

19 Saunders sent a letter to Barry expressing regret that plaintiffs were not permitted to enter and

20 acknowledging that she felt the students should have been allowed to participate.  Dkt #5, ¶35.

21 She also sent a letter to the parents of one of the plaintiffs, expressing disappointment over the

22 denial of entry and informing them that the College's attorney was instructed to research the law

23 on the issue to be better prepared for next time.  Dkt #5, ¶34.

24

1                                         **III.**    **SUMMARY JUDGMENT STANDARD**

2        Summary judgment is appropriate where "the pleadings, the discovery and disclosure

3 materials on file, and any affidavits show that there is no genuine issue as to any material fact

4 and that the movant is entitled to judgment as a matter of law." FRCP 56(c); *Anderson v.*

5 *Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The Court must draw all reasonable inferences

6 in favor of the non-moving party. *See F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th

7 Cir. 1992), *rev'd on other grounds*, 512 U.S. 79 (1994). In ruling on summary judgment, a

8 court does not weigh evidence to determine the truth of the matter, but "only determine[s]

9 whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir.

10 1994) (*citing O'Melveny & Meyers*, 969 F.2d at 747). Material facts are those which might

11 affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248.

12                                             **IV.**    **DISCUSSION**

13     **A. Protected Speech**

14         **i.**    **Type of Forum**

15       The first issue is determining whether plaintiff students had a right to free speech where

16 the forum consisted of a public college's gymnasium that was rented to a politician's campaign

17 organization. In determining whether a plaintiff was deprived of his or her First Amendment

18 right to freedom of speech, it is necessary to classify the type of public forum in which the

19 speech occurred. The three categories of government fora include (1) traditional public fora (2)

20 limited public fora, and (3) non-public fora. *Perry Education Ass'n v. Perry Local Educators'*

21 *Ass'n,* 460 U.S. 37, 45-46 (1983).

22       Traditional public fora consist of property held in trust for the public, such as streets and

23 parks, and remain open to the public regardless of the State's intent. *Id*. Limited Public fora

24

1 | consist of publicly held property not traditionally open to the public, but which the State has
2 | opened to the public for expressive activity by choice. *Cornelius v. NAACP Legal Defense*
3 | *Fund,* 473 U.S. 788, 800 (1985). However, a limited public forum is not created when the
4 | government allows selective access for individual speakers rather than general access for a class
5 | of speakers. *Arkansas Educ. Television Comm. v. Forbes*, 523 U.S. 666, 678 (1998). In a public
6 | or limited public forum, the government may only limit speech upon the showing of a
7 | compelling government interest where the restriction is narrowly tailored to serve that interest.
8 | *Cornelius,* 473 U.S. 788 at 800. Finally, in a non-public forum, the government may restrict
9 | speech as long as government officials are not doing so in an effort to engage in viewpoint
10 | discrimination. *Id*. Examples of non-public fora include hospitals and military bases.

11 |     *Widmar v. Vincent* affirmed the notion that, with respect to its students, a college campus
12 | has many attributes of a public forum, and the intellectual exchange of ideas and debate would
13 | be limited by allowing students to be denied the traditional media of communication with
14 | faculty, administrators, and other students. 454 U.S. 263, 268 (1981). *Widmar* also states that
15 | where a university is under no obligation to create an open forum but does so anyway, it assumes
16 | an obligation and may nonetheless be prohibited by the Constitution from enforcing exclusions
17 | to a forum generally open to the public. *Id.* at 267-268. While *Widmar* sheds light on how to
18 | classify the forum in the case at hand, *Widmar* does not address a situation where a public
19 | university has entered into a commercial venture to rent space to a private entity. Thus the
20 | significance of the fact that the university-owned space was in fact rented must be addressed.

21 |     **ii.**     **Rental Agreement**

22 |     Though there is no case on point that deals with a commercial rental in a university
23 | setting, courts have drawn a distinction where a government actor is engaged in a proprietary
24 |

1  (commercial) function. *Post Newsweek Stations-Connecticut Inc., v. Travelers Ins. Co.*, 510 F.
2  Supp. 81, 86 (D.Conn. 1982)(citing *Lehman v. City of Shaker Heights*, 418 U.S. 298, 302-303
3  (1974)). In that case, the court found that a municipality acting in a proprietary, rather than a
4  governmental capacity, when entering into a contract to lease a civic center could
5  constitutionally restrict a television station's access to an event at that center as long as the
6  government was not acting arbitrarily or capriciously. *Id.* The court also considered the forum
7  and the nature of the speech involved in balancing the conflicting interests. *Id*. The opinion
8  noted that while the forum was a public meeting place, there was no political speech or exchange
9  of ideas taking place, but rather the exposition of an athletic event, which was considered to be
10 on the periphery of protected speech. *Id.*
11     Similarly, when Bellevue College contracted to rent the gymnasium to the Cantwell
12 Campaign, it acted in a commercial, proprietary capacity. However, the balance of interests at
13 stake in this case differs significantly. The forum in question is a college campus – a place
14 where the free exchange and communication of ideas is fundamental. Moreover, the prohibited
15 expression at issue was political speech, "which occupies the highest, most protected position."
16 *R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992). Therefore, the balance of interests favors
17 the plaintiffs.
18     Moreover, as noted in *Widmar*, *supra*, once a university creates an open forum, it cannot
19 then proceed to enforce exclusions to an otherwise open forum. 454 U.S., at 267-268. Despite
20 the fact that Bellevue College entered into a private rental agreement, an e-mail sent by the
21 Director of Public Safety conveyed to the College's students that the Cantwell Campaign would
22 permit all students, faculty, and staff to attend the event. Dkt #24, Exhibit 3. Moreover, several
23 professors at the College either assigned or encouraged students in their classes to attend the
24

Campaign event. Dkt #28, ¶6; Dkt #29, ¶5; Dkt #33, ¶4. Plaintiffs were concerned that their attendance would be construed as support. Dkt #28, ¶5; Dkt #29, ¶4; Dkt #33, ¶5. The e-mail stating that all students are welcome to attend the event, along with assignments by professors requiring students to participate in the event both diminish the significance of the fact that the event was the product of a private rental agreement. Through the action of College faculty and administrators, the Cantwell Campaign event was converted into an open forum from which plaintiffs could not be excluded due to their expression of support for an opposing candidate.

Finally, despite the existence of the rental contract with the Cantwell Campaign, the College maintained the ability to exercise control over the event. The contract terms reveal that the College expressly reserved the right to cancel any event in progress if the event staff or participants refuse to cooperate with College staff. Dkt #24, Exhibit 1, Cancellation ¶ 2. After plaintiffs were denied entry to the event by a campaign employee, defendant Saunders attempted to persuade the employee to allow the plaintiffs to enter the event. Dkt #5, ¶ 32-33. When the campaign manager continued to refuse, Saunders decided not to allow the students to attend the event. Under the terms of the contract, Fithian and Saunders could have insisted that the students be admitted and had the authority to cancel the event in light of the Campaign manager's continued refusal to permit plaintiffs to participate in the event.

For the foregoing reasons, the exclusion of plaintiffs from the event constituted a violation of their First Amendment rights.

**B. Qualified Immunity**

Qualified immunity seeks to guarantee that public officials who are subjected to suit are on notice that their actions were unlawful. *Hope v. Pelzer*, 536 U.S. 730 (2002). In order to make a determination regarding qualified immunity, a court may first determine that, given the

1 | facts alleged and in the light most favorable to the plaintiff, the official's conduct violated the
2 | plaintiff's constitutional right. *Saucier v. Katz*, 533 U.S. 195 (2001). In addition, the very
3 | conduct in question need not have previously been held unlawful in order for a court to dispense
4 | with qualified immunity. *Hope*, 536 U.S. at 739. If a constitutional right was violated, then it
5 | must be determined that the right was clearly established. This determination rests upon the
6 | specific context of the case, and not a broad general proposition. *Id.* Moreover, the court must
7 | inquire as to whether it would be clear to a reasonable official that his or her conduct was
8 | unlawful in the given situation. *Saucier*, 533 U.S. The recent decision of *Pearson v. Callahan*
9 | permits the court, at its discretion, to determine which prong of the analysis should be addressed
10 | first in light of the circumstances. 129 S. Ct 808 (2009).

11 |       In the case at hand, as previously indicated, the defendant College officials violated
12 | plaintiffs' First Amendment rights. However, defendants would still be entitled to qualified
13 | immunity if the constitutional right that they violated was not clearly established. Whether
14 | plaintiffs' constitutional rights were clearly established depends on the specific context of the
15 | case.

16 |       As the events unfolded that gave rise to this action, defendants Saunders and Fithian were
17 | unsure what the proper course of conduct was. Defendant Saunders stated that "[she] did not
18 | know whether the college could legally insist that the students be allowed in over the strong
19 | objection of Tim Barry of the Cantwell Campaign." Dkt #24, ¶ 10. Defendant Fithian stated that
20 | he made the decision to exclude plaintiffs from the event because there were many people
21 | "yelling" at them. Dkt #22, Exhibit 3, p.35. However, the record before the court simply does
22 | not contain any evidence of danger such as threats or acts of violence directed against plaintiffs
23 | that could justify their exclusion from the event. The right of freedom of expression cannot be
24 |

1  overcome out of fear of creating a disturbance.  *Tinker v. DesMoines Indep. Sch. Dist.*, 393 U.S.

2  503, 508-509 (1969).  Moreover, defendant officials should have been aware of the extent of

3  their own authority.  As noted, the contract with the Cantwell Campaign reserved the right of

4  College staff to cancel an event that is already underway if event staff do not cooperate or if the

5  event creates unreasonable difficulties.  Dkt #24, Exhibit 1, Cancellation ¶ 2.  Similarly,

6  defendants were aware that all students received an e-mail from the College informing them that

7  they were welcome to attend the event.  Dkt #24, Exhibit 3.  Under these circumstances, it was

8  unreasonable for defendants to exclude plaintiffs on the basis of their political speech from an

9  event at the College where plaintiffs were students.  Defendants should have recognized a clearly

10  established right to free speech based on an assessment of the situation at hand.  *See Giebel v.*

11  *Sylvester*, 244 F.3d 1182, 1189 (9th Cir. 2001) (stating that even if there is no closely analogous

12  case law, a right can be clearly established on the basis of "common sense").  Thus, defendants

13  are liable for violating plaintiffs' constitutional rights as a matter of law.

14          **C.  Punitive Damages under 42 U.S.C. §1983**

15          Punitive damages are available in §1983 actions. *Cinevision Corp. v. City of Burbank*,

16  745 F.2d 560, 577 (9th Cir. 1984).  However, conduct must involve malice, recklessness, or

17  callous indifference to a federal right in order to bring the issue of punitive damages before a

18  jury.  *Smith v. Wade*, 461 U.S. 30 (1983).  Absent the requisite threshold conduct, a claim for

19  punitive damages under §1983 cannot proceed to trial.  While defendants' exclusion of plaintiffs

20  from the event constituted an unreasonable course of conduct under the circumstances,

21  defendants were acting under the stress of the moment.  Even though the actions of defendants

22  Saunders and Fithian were misdirected, Fithian acted out of concern for the well-being of the

23  event participants (Dkt #22, Exhibit 3, p.29) and Saunders made some attempt to persuade the

24

Cantwell Campaign to allow plaintiffs to participate in the event. Dkt #24, ¶ 6. There is no evidence that would suggest that defendants engaged in the type of conduct that would properly allow the issue of punitive damages to be placed before a jury, and therefore punitive damages are not available as a matter of law.

### D. Claims under the Washington State Constitution

Because defendants have violated plaintiffs' right to freedom of speech under the United States Constitution, so too have defendants violated plaintiffs' right to freedom of speech under the Washington Constitution. Article 1, §5 of the Washington Constitution provides at a minimum the same protection to freedom of speech as the United States Constitution, and in certain contexts provides more protection. WA. Const. Art. 1, §5; *Bradburn v. North Cent. Regional Library Dist.*, 231 P.3d 166, 172-173 (2010). The Washington Constitution provides greater protection in the areas of time, place, and manner restrictions, and it categorically prohibits prior restraints on protected speech. *Id*. Therefore, plaintiffs maintain a claim for a violation of their freedom of speech under the Washington Constitution as a matter of law.

## V. CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Defendants' Motion for Summary Judgment is GRANTED IN PART as to the issue of punitive damages, and DENIED IN PART as to the issue of liability.

(2) Plaintiffs' Cross-Motion for Partial Summary Judgment is GRANTED as to the issue of liability, and the issue of damages is reserved for trial.

Dated September 23, 2010.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE